# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTEFIORE MEDICAL CENTER**<br>**111 East 210th Street**<br>**The Bronx, NY 10467-2490**<br><br>**Plaintiff,**<br><br>v.<br><br>**MICHAEL O. LEAVITT, Secretary,**<br>**U.S. DEPARTMENT OF HEALTH AND**<br>**HUMAN SERVICES**<br>**200 Independence Avenue, S.W.**<br>**Washington, DC 20201**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Case No. _____ |

## COMPLAINT FOR
## JUDICIAL REVIEW OF AGENCY ACTION

Submitted by

Dennis M. Barry
D.C. Bar #00375152
VINSON & ELKINS LLP
1455 Pennsylvania Avenue, NW
Suite 600
Washington, D.C. 20004-1008
(202) 639-6791

Attorney for Plaintiff

December 11, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTEFIORE MEDICAL CENTER**<br>**111 East 210th Street**<br>**The Bronx, NY 10467-2490**<br><br>**Plaintiff,**<br>v.<br><br>**MICHAEL O. LEAVITT, Secretary,**<br>**U.S. DEPARTMENT OF HEALTH AND**<br>**HUMAN SERVICES**<br>**200 Independence Avenue, S.W.**<br>**Washington, DC 20201**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Case No. _____** |

## COMPLAINT FOR JUDICIAL REVIEW OF AGENCY ACTION

Plaintiff states:

1.    Plaintiff, Montefiore Medical Center ("the Plaintiff"), seeks judicial review of the final administrative decision of the Secretary of the United States Department of Health and Human Services ("Secretary") as to the amount of Medicare payment due the Plaintiff for services furnished during the Plaintiff's cost reporting period ending on December 31, 1990.

### I. JURISDICTION AND VENUE

2.    This action arises under the Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hh, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-576, 701-706.

3.    The Court has jurisdiction pursuant to 42 U.S.C. § 1395oo(f)(1), which allows a provider of services under the Medicare program to obtain judicial review of a decision by the

Secretary reversing or modifying a decision by the Provider Reimbursement Review Board ("PRRB").

4.      Venue is proper in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1).

5.      This action is timely filed in accordance with 42 U.S.C. § 1395oo(f)(1), in that it has been brought within 60 days of Plaintiff's receipt of the Secretary's decision.

6.      Pursuant to Local Civil Rule 40.5(a), this case is related by reason of common issues of fact and law to a case still pending on the merits before this Court.  The earlier case is Montefiore Medical Center v. Leavitt, Case No. 1:06-CV-1636 (RMU).

## II. THE PARTIES

7.      Montefiore Medical Center is an academic medical center located in The Bronx, New York.  The Plaintiff is organized as a domestic not-for-profit corporation under the laws of New York.  The Plaintiff is and was at all times relevant hereto a "provider of services" participating in the Medicare Program established under Title XVIII of the Social Security Act. Among many other services, during the Plaintiff's cost reporting period ending December 31, 1990, the Plaintiff operated a hospital-based skilled nursing facility ("SNF") known as the Loeb Center in The Bronx, New York.

8.      Defendant, Michael O. Leavitt, Secretary of the United States Department of Health and Human Services, is sued in his official capacity. Defendant is the federal officer to whom Congress has delegated administration of the Medicare program.  Defendant exercises the administrative responsibility of the Medicare program primarily through the Centers for Medicare and Medicaid Services (sometimes referred to herein as "CMS," also formerly known

as the Health Care Financing Administration), an agency of HHS.  Defendant also contracts with private organizations to act as fiscal intermediaries for the Medicare Program.  42 U.S.C. § 1395h(a).  The fiscal intermediary responsible for making determinations on the amount of Medicare payment to be made to the Plaintiff was the Blue Cross/Blue Shield Association and National Government Services ("Fiscal Intermediary").

## III.  GENERAL BACKGROUND

### A.     Background on the Medicare Program and the Routine Cost Limitation

9.     The Medicare program is a federal health insurance program that furnishes benefits to qualifying patients who have attained the age of 65 or who are disabled.  *See* 42 U.S.C. §§ 1395i-2(a), 1395j; 42 C.F.R. § 407.10.  The benefits include payment for post-hospital extended care services furnished in a skilled nursing facility.  42 U.S.C. § 1395d(a)(2).  The statutory provisions governing the Medicare program are set forth at 42 U.S.C. § 1395 *et seq.*

10.     The Medicare program is administered by CMS,[1] an agency within the United States Department of Health and Human Services.

11.     The Secretary contracts with private organizations known as "fiscal intermediaries" or "intermediaries" to make determinations of the amounts payable to providers for services furnished to Medicare beneficiaries.  *See* 42 U.S.C. §1395h(a).

12.     A skilled nursing facility owned by a hospital could qualify for "hospital-based" (also called provider-based) status.

---

[1]  The Centers for Medicare and Medicaid Services ("CMS") was known as the Health Care Financing Administration ("HCFA") during the year under appeal.  For simplicity's sake, this complaint refers to the agency as CMS.

13.     During the time period relevant to this matter, the Medicare program reimbursed eligible hospital-based skilled nursing facilities and freestanding skilled nursing facilities for the "reasonable cost" of covered services provided to Medicare beneficiaries.    42 U.S.C. § l395x(v)(1)(A).  "Reasonable cost" is defined in the statute as those costs "actually incurred, excluding therefrom any part of incurred cost[s] found to be unnecessary in the efficient delivery of needed health services." *Id.*

14.     Congress delegated the responsibility for establishing methods for determining reasonable cost to the Defendant Secretary.   The reasonable cost "shall be determined *in accordance with regulations* establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services." 42 U.S.C. § l395x(v)(1)(A) (emphasis added).

15.     The statute prohibits Medicare and other payers from "cross-subsidizing" each other.  *See* 42 U.S.C. § l395x(v)(1)(A).  The statute states that

> [s]uch regulations *shall* (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.

42 U.S.C. § l395x(v)(1)(A) (emphasis added);  *see also* 42 C.F.R. §§ 413.5(a), 413.50(b).

16.     The Secretary is authorized to establish appropriate cost limits as part of the method of determining reasonable costs.  42 U.S.C. § 1395x(v)(1)(A).

17.     Prior to 1984, the Defendant Secretary had established routine cost limitations for SNFs. The routine cost limitation for freestanding SNFs was set at 112 percent of the peer group

mean for freestanding SNFs, and the routine cost limitation for hospital-based SNFs was set at 112 percent of the peer group mean for hospital-based SNFs. The routine cost limitation for hospital-based SNFs was higher than that of freestanding SNFs.

18.     The routine cost limitation for hospital-based SNFs changed as part of the Deficit Reduction Act of 1984 ("DEFRA"). Pub. L. No. 98-369, § 2319(b), 1984 U.S.C.C.A.N. (98 Stat.) 494, 1083 (codified at 42 U.S.C. § 1395yy). While the routine cost limitation for freestanding SNFs remained the same, the limitation for hospital-based SNFs was lowered to "the limit for freestanding skilled nursing facilities . . . , plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities . . . exceeds the limit for freestanding skilled nursing facilities." 42 U.S.C. § l395yy(a)(3)-(4).

19.     The atypical services exception was first issued as a regulation effective July 1, 1974. Federal Health Insurance for the Aged and Disabled; Limitations on Coverage of Costs; Interim Schedule, 39 Fed. Reg. 20163, 20164 (June 6, 1974) (codified at 42 C.F.R. § 405.460(f)(2)). The language of the regulation was revised effective July 1, 1979. Medicare Program; Limiting Reimbursement for Provider Costs and For Services by Hospital-Based Physicians, 44 Fed. Reg. 31802, 31804 (June 1, 1979) (codified at 42 C.F.R. § 405.460(f)). The regulation was redesignated as 42 C.F.R. § 413.30(f) in 1986, with no changes to its text. Medicare Program; Redesignation of Reasonable Cost Regulations, 51 Fed. Reg. 34790 (Sep. 30,

1986).  This designation was in use during the time period relevant to this dispute, and is the

designation used throughout the complaint.[2]

20.     Medicare regulations allow exceptions to the routine cost limitation to be granted

for SNFs which provide atypical services as defined therein.   42 C.F.R. § 413.30(f) reads as

follows:

> (f)     Exceptions.   Limits established under this section may be
> adjusted … for a provider under the circumstances specified….   An
> adjustment is made only to the extent the costs are reasonable, attributable
> to the circumstances specified, separately identified by the provider, and
> verified by the intermediary.
>
> > (1) Atypical services.  The provider can show that the --
> >
> > > (i)  Actual cost of items or services furnished by a
> > > provider exceeds the applicable limit because such
> > > items or services are atypical in nature and scope,
> > > compared to the items or services generally furnished
> > > by providers similarly classified; and
> > >
> > > (ii) Atypical items or services are furnished because
> > > of the special needs of the patients treated and are
> > > necessary in the efficient delivery of needed health
> > > care.

21.     Following the revision of the regulation in 1979, the Secretary interpreted the

regulation to allow full reimbursement for costs above the routine cost limitation that were the

result of atypical services.  *See* 44 Fed. Reg. 31802, 31804 (June 1, 1979).

22.     The 1984 statutory amendments did not alter the Secretary's rules permitting

SNFs qualifying for an atypical services exception from receiving full reimbursement of

reasonable costs, and the legislative history states that providers meeting the criteria for

---

[2]   The regulation has since been amended and redesignated as 42 C.F.R. § 413.30(e).  Medicare Program; Revisions
of the Procedures for Requesting Exceptions to Cost Limits for Skilled Nursing Facilities and Elimination of
Reclassifications, 64 Fed. Reg. 42610, 42612 (Aug. 5, 1999).

exception relief  should receive "up to all of their reasonable costs" through the exception process:

> Under this provision, *both hospital-based and freestanding facilities* could continue to apply for and receive exceptions from the cost limits in circumstances where high costs result from more severe than average case mix or circumstances beyond the control of the facility. Indicators of more severe case mix include a comparatively high proportion of Medicare days to total patient days, comparatively high ancillary costs, or relatively low average length of stay for all patients (an indicator of the rehabilitative orientation of the facility). *Facilities eligible for exceptions could receive, where justified, up to all of their reasonable costs.*

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, *as reprinted in* Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 (Apr. 13, 1984) (emphasis added). After the 1984 codification of 42 U.S.C. § 1395yy(a), and consistent with this legislative history and with his interpretation of 42 C.F.R. § 413.30(f)(1) prior to the codification of 42 U.S.C. § 1395yy, the Secretary continued to measure the exceptions he awarded to hospital-based SNFs from the routine cost limitation, and not from some point above the routine cost limitation.

23.    In July 1994, ten years after the codification of 42 U.S.C. § 1395yy, the Secretary, through the Health Care Financing Administration (HCFA, now CMS) issued Transmittal No. 378 which published new provisions of the Provider Reimbursement Manual relating to SNF exception requests. This transmittal added PRM § 2534.5, which required that the atypical services exception amount for a hospital-based SNF be measured not from its routine cost limitation, as had been the Secretary's interpretation up through July 1994, but that it now be

measured from 112 percent of the SNF's peer group mean, a point significantly higher than the routine cost limitation for a hospital-based SNF. The Secretary thereby created a reimbursement "gap" by which all hospital-based SNFs that provide atypical services to their patients could never receive reimbursement for their per diem costs between the routine cost limitation and 112 percent of the peer group mean. There was no notice or opportunity for public comment prior to the promulgation of the new manual provision, and the change in reimbursement occurred despite the fact that such hospital-based SNFs met the regulatory requirements of 42 C.F.R. § 413.30(f) for the atypical services exception.

24.     Although the new manual provision was published in July 1994, it was applied retrospectively to Plaintiff for its requests for reimbursement for its fiscal year 1990.

### B.     Factual and Procedural Background

25.     The Loeb Center, Plaintiff's hospital-based SNF, furnished the requisite atypical services, entitling the Plaintiff to the routine cost limit exception available under 42 C.F.R. § 413.30(f).

26.     Pursuant to 42 C.F.R. § 413.30(f)(1), the Plaintiff requested that its hospital-based SNF be granted an exception to the routine cost limitation for its fiscal year ending December 31, 1990, because it furnished atypical services during this cost reporting period. The Fiscal Intermediary and the Secretary agreed that the Plaintiff had provided atypical services and was entitled to an award of additional reimbursement in the form of an exception amount. However, pursuant to PRM § 2534.5, the Fiscal Intermediary and the Secretary reimbursed the Plaintiff only for its costs in excess of 112 percent of the peer group mean, rather than for all its costs in excess of the routine cost limitation, as had been the Secretary's interpretation of its

governing regulation for a period of twenty years. This resulted in a reimbursement gap between the reasonable cost limitation and the exception for atypical services payment of approximately $319,132, which represents the amount of reasonable costs for which the Plaintiff was not reimbursed due solely to the application of PRM § 2534.5. (Plaintiff does not seek a money judgment, but instead prays for a reversal of the Secretary's decision and a remand to the Secretary to compute amounts owing to Plaintiff pursuant to the Court's order.)

27.    Plaintiff filed a timely appeal of the denial of its full costs in excess of the routine cost limitation with the Provider Reimbursement Review Board ("PRRB") for the cost reporting period at issue. The PRRB is a board established by the Secretary to hear appeals by a provider of health care services when a provider is not satisfied with the amount of Medicare payment. A decision of the PRRB becomes a final decision unless the Secretary reverses, affirms, or modifies the decision. *See* 42 C.F.R. §§ 405.1871, 405.1875.

28.    On August 14, 2007, the PRRB issued its decision in this case, finding Plaintiff entitled to reimbursement for all of its costs in excess of the routine cost limitation. *Montefiore Med. Ctr. v. BlueCross BlueShield Ass'n/National Government Services,* PRRB Dec. No. 2007-D61, MEDICARE AND MEDICAID GUIDE (CCH) ¶ 81,772 (Aug. 14, 2007). A true and correct copy of this decision is attached hereto as Exhibit A.

29.    On August 22, 2007, the Secretary informed the parties that he would review the PRRB decision pursuant to his authority under 42 U.S.C. § 1395oo(f).

30.    In a decision dated October 12, 2007 the Administrator of CMS, acting as the delegate of the Secretary, reversed the PRRB's decision. *Montefiore Med. Ctr. v. BlueCross Blue Shield Ass'n/National Gov. Serv-NY.,* Adm'r Dec. (Oct 12, 2007). The Administrator's

decision found that the methodology used in PRM § 2534.5 was an appropriate application of the reasonable cost requirements and was not inequitable. *Id.* The Administrator also found that PRM § 2534.5 did not represent a change in CMS policy and thus the agency was not required to engage in notice and comment rulemaking before promulgating the manual provision at issue in this case. *Id.* A true and correct copy of the Administrator's decision is attached hereto as Exhibit B. The Administrator's decision is final agency action and is referred to below as the Secretary's decision.

31.    Pursuant to 42 U.S.C. § 1395oo(f), Plaintiff is seeking judicial review of the Secretary's decision.

## IV. CLAIM FOR RELIEF

32.    Plaintiff seeks a reversal of the Secretary's decision failing to grant full reimbursement of costs attributable to atypical services and a remand of this matter for a new reimbursement decision for the following reasons.

33.    The Secretary's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because:

   a.  It is inconsistent with the governing regulation, 42 C.F.R. § 413.30(f)(1), as well as the legislative history of the governing statute, 42 U.S.C. § 1395yy(a).

   b.  It violates the statutory prohibition against cross-subsidization between beneficiaries of the Medicare program and other insurance programs. 42 U.S.C. § 1395x(v)(1)(A).

c.  It is an arbitrary and capricious departure from the Secretary's long-standing practice of measuring atypical service exceptions from the point of the routine cost limitation, and as such is an abuse of discretion. *See St. Luke's Methodist Hospital v. Thompson*, 315 F.3d 984, 988 (8th Cir. 2003); *Mercy Medical Skilled Nursing Facility v. Thompson*, 2004 WL 3541332, at *2 – *3 (D.D.C. 2004) (unreported); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

d.  It arbitrarily and capriciously discriminates in favor of freestanding SNFs and against hospital-based SNFs, in that freestanding SNFs qualifying for the atypical services exception can receive full reimbursement of all costs in excess of the routine cost limitation, but qualifying hospital-based SNFs cannot receive full reimbursement.

e.  The Secretary's decision is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), because it is a retroactive application of PRM § 2534.5. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 215 (1988) ("Our interpretation of the Medicare Act compels the conclusion that the Secretary has no authority to promulgate retroactive cost-limit rules.").

f.  The Secretary's decision was contrary to law and in excess of statutory authority in that it relies upon an application of PRM § 2534.5, which was not promulgated in accordance to the rulemaking procedures of the APA or the Social Security Act. The APA requires notice and comment rulemaking procedures be followed when an agency enacts a new substantive rule, *Air Transp. Ass'n of Am. v. Fed.*

*Aviation Admin.,* 291 F.3d 49, 55-56 (D.C.Cir. 2002), or when an agency changes a definitive interpretation of a substantive rule, *Alaska Prof'l Hunters Ass'n, Inc., v. Fed. Aviation Admin.,* 177 F.3d 1030, 1033-34 (D.C.Cir. 1999). The Social Security Act similarly requires notice and comment procedures be followed before altering an existing substantive legal standard. 42 U.S.C. § 1395hh(a)(2). Because PRM §2534.5 was not adopted pursuant to notice and comment rulemaking procedures, the Secretary's decision applying the manual provision was contrary to law and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C).

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

34.    That the Court set aside the Secretary's final decision and remand this matter to the Secretary and order that the Secretary compute the amount payable under the previously granted exception to the routine cost limitation for its fiscal year ending December 31, 1990, so as to include reimbursement for the provider's costs between the routine cost limitation and 112 percent of the peer group mean.

35.    That the Court award Plaintiff the interest that it is entitled to as a matter of right under 42 U.S.C. § 1395oo(f)(2);

36.    That the Court award Plaintiff costs; and

37.    That the Court grant to Plaintiff such other relief that the Court deems proper.

Respectfully submitted,

Dennis M. Barry
D.C. Bar #00375152
VINSON & ELKINS LLP
1455 Pennsylvania Avenue, NW
Suite 600
Washington, D.C.  20004-1008
(202) 639-6791

Attorney for Plaintiff

December 11, 2007

DC 727619v1

**Exhibit A**

# PROVIDER REIMBURSEMENT REVIEW BOARD
# DECISION
ON THE RECORD
2007-D61

**PROVIDER -**
Montefiore Medical Center
New York City, New York

Provider No.: 33-0059

**vs.**

**INTERMEDIARY -**
BlueCross BlueShield Association/
National Government Services - NY

**DATE OF HEARING -**
July 24, 2007

Cost Reporting Period Ended -
December 31, 1990

**CASE NO.:** 96-1582

## INDEX

| | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 3 |
| Parties' Contentions | 4 |
| Findings of Fact, Conclusions of Law and Discussion | 5 |
| Decision and Order | 9 |

ISSUE:

Whether the Intermediary improperly limited the Provider's hospital-based Skilled
Nursing Facility's (SNF's) routine cost limit exception amount to costs in excess of 112
percent of its peer group costs rather than costs in excess of the routine cost limit.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a health care provider.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C.
§§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the
Health Care Financing Administration (HCFA), is the operating component of the
Department of Health and Human Services (DHHS) charged with the program's
administration. CMS' payment and audit functions under the Medicare program are
contracted out to insurance companies known as fiscal intermediaries. Fiscal
intermediaries determine payment amounts due providers under Medicare law and
interpretative guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R.
§§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal
intermediary showing the costs it incurred during the fiscal year and the portion of those
costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews
the cost report, determines the total amount of Medicare reimbursement due the provider,
and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R
§405.1803. A provider dissatisfied with the intermediary's final determination of total
reimbursement may file an appeal with the Provider Reimbursement Review Board
(Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo; 42 C.F.R.
§405.1835.

Section 1819(a)(1) of the Social Security Act (Act) defines a SNF as an institution
engaged in providing skilled nursing and related services for residents who require
medical and nursing care or rehabilitative services for injured, disabled or sick persons.
Section 1861(v)(1)(A) of the Act establishes the method of cost reimbursement for SNFs
as well as limitations on reimbursable costs. These limitations are called routine cost
limits (RCL) and are addressed in §§1861(v)(7)(B) and 1886(a) of the Act. 42 C.F.R.
§413.30 implements the cost reimbursement limits for SNFs and also provides an
exception to the limits for providers of "Atypical Services." 42 C.F.R. §413.30(f),
states, in part:

> Exceptions. Limits established under this section may be adjusted upward
> for a provider under the circumstances specified in paragraphs (f)(1)
> through (f)(5) of this section. . . . An adjustment is made only to the
> extent the costs are reasonable, attributable to the circumstances specified,
> separately identified by the provider, and verified by the intermediary.

> (1) Atypical services. The provider can show that the---

(i) Actual cost of items or services
furnished by a provider exceeds
the applicable limit because such
items or services are atypical in
nature and scope, compared to the
items or services generally
furnished by providers similarly
classified; and

(ii) Atypical items or services are
furnished because of the special
needs of the patients treated and
are necessary in the efficient
delivery of needed health care.

The intent of Congress in providing an exception to the cost limits to compensate
providers for the additional costs associated with the provision of atypical services was to
ensure that providers would be reimbursed their full costs for providing those additional
services and that patients not covered by Medicare would not be unfairly burdened with
subsidizing the cost of the care of Medicare patients.  42 U.S.C. §1395yy(a); 42 U.S.C.
§1395x(v)(1)(A).

The issue in dispute in this appeal is whether the Intermediary improperly limited the
exception amount to which the Provider was entitled under 42 C.F.R. §413.30(f) of the
Medicare regulations.

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Montefiore Medical Center (Provider) is an acute care hospital located in New York City,
New York.  During its cost reporting period ended December 31, 1990, the Provider's
facility included a hospital-based SNF.  The Provider's SNF was reimbursed based upon
the reasonable costs it incurred to provide health care services to Medicare beneficiaries
(42 U.S.C. §1395x(v)) and was subject to the cost limits placed upon SNFs at  42 U.S.C.
§1395yy.

In accordance with 42 C.F.R. §413.30(f)(1), the Provider requested an exception to the
SNF cost limits based upon the provision of furnishing atypical services.  Empire
Medicare Services (Intermediary) reviewed the Provider's request and forwarded it to
CMS, where it was approved.[1]  However, the Provider disagrees with the methodology
used to calculate the amount of the exception ultimately granted.  The Provider believes it
should be reimbursed all of its costs in excess of the limit.  The Provider's argument is
based upon 42 U.S.C. §1395yy(3), which sets the limit for hospital-based SNFs at the
limit established for freestanding SNFs plus 50 percent of the amount by which 112
percent of the mean per diem routine service costs for hospital-based SNFs exceeds the
limit for freestanding SNFs.  The Intermediary, however, calculated the amount of the

---

[1] National Government Services has replaced Empire Medicare Services as the Provider's intermediary.

Provider's exception based upon program instructions in Medicare's Provider
Reimbursement Manual, Part I (HCFA Pub. 15-1) §2534, entitled <u>Request For Exception
to SNF Cost Limits</u>. In effect, the manual directs intermediaries to calculate cost limit
exceptions for hospital-based SNFs at amounts exceeding 112 percent of the mean per
diem routine service costs for hospital-based SNFs "(not the cost limit). . . ."[2]

The Provider appealed the methodology used by the Intermediary to determine its cost
limit exception to the Board pursuant to 42 C.F.R. §§405.1835-405.1841 and met the
jurisdictional requirements of those regulations. The amount of Medicare funds in
controversy is approximately $319,000.[3]

The Provider was represented by Dennis M. Barry, Esq., of Vinson & Elkins LLP. The
Intermediary was represented by Arthur E. Peabody, Esq., Associate Counsel, Blue Cross
Blue Shield Association.

<u>PARTIES' CONTENTIONS</u>:

The Provider claims that by refusing to grant an exception for the portion of its per diem
costs which do not exceed 112 percent of the total peer group mean cost, CMS has
created a reimbursement "gap" that is arbitrary, capricious, not in accordance with
Medicare law, and denies reimbursement of costs that qualify as an exception for atypical
services.

In addition, the Provider contends that the "gap" methodology in HCFA Pub. 15-1
§2534.5 directly contradicts the regulation controlling atypical service exceptions. The
Provider believes that CMS should be given no deference in interpreting this regulation
because it has not applied its interpretation consistently over time, and its interpretation is
not the result of thorough and reasoned consideration. The "gap" methodology in HCFA
Pub. 15-1 §2534.5 is also inconsistent with the statute prohibiting cross-subsidization
between Medicare and other payors.

The Provider also believes that the "gap" methodology in HCFA Pub. 15-1 §2534.5
is invalid because it was not adopted pursuant to the notice and comment rule making
provisions of the Administrative Procedure Act (APA) or as a regulation as required by
statute.

Additionally, the Provider contends that the language of 42 C.F.R. §413.30(f)(1) could
not have originally been intended to support the reimbursement "gap" of HCFA Pub. 15-
1 §2534.5 because the original interpretation of the regulation that measured exceptions
from the cost limits had been consistently maintained by CMS for fifteen years prior to
the issuance of HCFA Pub. 15-1 §2534. CMS' current interpretation of the regulation
was not developed contemporaneously with the regulation's original promulgation and is

---

[2] HCFA Pub. 15-1 §2534 was implemented in July 1994 through the issuance of CMS Program Transmittal
No. 378.

[3] Provider's Position Paper (December 13, 2006) at 3. Intermediary's Supplemental Position Paper at 2.

inconsistent with CMS' earlier interpretations; therefore, it is due no deference. The Provider cites St. Luke's Methodist Hospital v. Thompson, 182 F. Supp. 2d 765 (N. D. Iowa 2001), aff'd. Eighth Circuit (St. Luke's), finding HCFA Pub. 15-1 §2534.5 "invalid as an unreasonable interpretation of 42 C.F.R. §413.30 in light of the language of that regulation and the principles underlying the Medicare statute," and Mercy Medical Skilled Nursing Facility v. Thompson, C.A. 99-2765 (D.D.C. May 14, 2004) striking down CMS' approach of limiting exception relief to costs in excess of 112 percent of the peer group.

Finally, the Provider contends that HCFA Pub. 15-1 §2534.5 may not be applied retrospectively to the subject cost reporting period. Bowen v. Georgetown University Hospital, 488 U. S. 204 (1988). The Provider points out that the cost reporting period at issue is the fiscal year ended December 31, 1990, and that the "gap" methodology was not introduced until July 1994.

The Intermediary contends that the Provider's cost limit exception request was properly calculated in accordance with HCFA Pub. 15-1 §2534.5 which prescribes the methodology for making that calculation. The Intermediary relies upon the Administrator's decision in Montefiore Medical Center v. Blue cross Blue Shield Association/Empire Medicare Services, PRRB Dec. No. 2006-D29, June 5, 2006, rev'd., CMS Administrator, July 26, 2006, finding that HCFA Pub. 15-1 §2534.5 is consistent with the plain meaning of the pertinent statute and regulations.[4]

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board, after consideration of Medicare law and guidelines, parties' contentions, and evidence presented, finds as it did in Hi-Desert Medical Center v. United Government Services/Blue Cross Blue Shield Association, PRRB Dec. No. 2007-D17, February 2, 2007, rev'd., CMS Administrator, April 2, 2007. The methodology applied by CMS in partially denying the Provider's exception request for per diem costs that exceeded the cost limit was not consistent with the statute and regulation relating to this issue.[5]

The regulation, 42 C.F.R. §413.30(f)(1), permits the Provider to request from CMS an exception from the cost limits because it provided atypical services. It is undisputed that for 15 years the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the limits if it demonstrated that it met the exception requirements. The Provider's exception request was processed in accordance with HCFA Transmittal No. 378, which was issued in July 1994, and decreed that the atypical services exception of every hospital-based SNF must be measured from 112 percent of

---

[4] Intermediary's Supplemental Position Paper at 3, 4.

[5] This decision is also consistent with the Board in Glenwood Regional Medical Center v. Mutual of Omaha Insurance Company, PRRB Dec. No. 2004-D23, January 7, 2004, rev'd, CMS Administrator, August 9, 2004, and Montefiore Medical Center v. Blue cross Blue Shield Association/Empire Medicare Services, PRRB Dec. No. 2006-D29, June 5, 2006, rev'd., CMS Administrator, July 26, 2006.

the peer group mean for that hospital-based SNF rather than the SNF's limit. This specific requirement was also established as HCFA Pub. 15-1 §2534.5.

In essence, CMS replaced the limit with an entirely new and separate "cost limit" (112 percent of the peer group mean routine services cost). It is also undisputed that 112 percent of the peer group mean of hospital-based SNFs is significantly higher than the hospital's cost limit. As a result, under HCFA Pub. 15-1 §2534.5, a reimbursement "gap" is created between the limit and 112 percent of the peer group mean that represents costs incurred by a hospital-based SNF which it is not allowed to recover.

CMS reached a conclusion regarding the intent of Congress toward reimbursing the *routine* costs of hospital-based SNFs which provide only *typical* services and illogically applied that same rationale to hospital-based SNFs that provide *atypical* services. This is contrary to what Congress intended when it implemented the exception process to address the additional costs associated solely with the provision of atypical services, and it clearly represents a substantive change in CMS' prior interpretation and application of 42 C.F.R. §413.30(f), which states:

> Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent the costs are reasonable, attributable to circumstances specified, separately identified by the provider, and verified by the intermediary.

The only limit intended by Congress and imposed by the plain language of the applicable statute and regulation is the cost limit. To qualify for an atypical services exception a provider must show that the "actual cost of items and services furnished by a provider *exceeds the applicable limit because such items are atypical* in nature and scope, compared to the items or services generally furnished by providers similarly classified." (emphasis added). The fact that the Provider was providing atypical services and, but for the methodology described would have been entitled to an exception, was not contested by CMS.

The controlling regulation specifically states that a provider must only show that its cost "exceeds the applicable limit," not that its cost exceeds 112 percent of the peer group mean. The comparison to a peer group of "providers similarly classified," required by the regulation, is of the "nature and scope of the <u>items</u> and <u>services</u> actually furnished" (emphasis added), not of their cost. Also, it must be noted that Congress itself established the four "peer groups" that are to be considered in determining Medicare reimbursement of skilled nursing facilities: free-standing urban, free-standing rural, hospital-based urban, and hospital-based rural. CMS has no statutory or regulatory authority to establish a *new* "peer group" for hospital-based SNFs (112 percent of the peer group mean routine service cost) and determine atypical service exceptions from an entirely *new* cost limit rather than from the limit intended by Congress.

In addition, the provisions of HCFA Pub. 15-1 §2534.5 that require an exception for hospital-based SNFs to be measured from "112 percent of the peer group mean" rather than from the routine cost limit are invalid because they have not been adopted pursuant to notice and comment rulemaking as required by the APA.

In this case, CMS' methodology is a departure from its earlier method of determining the amount for hospital-based SNF exception requests and requires an explanation for its change of direction. It is a "clear tenet of administrative law that if the agency wishes to depart from its consistent precedent it must provide a principled explanation for its change of direction." National Black Media Coalition v. FCC 775 F.2d 342, 355 (D.C. Cir. 1985).

42 U.S.C. §1395yy only set the formula for determining the cost limit; it did not change the method to be used to determine exceptions to the cost limit nor provide CMS with any legal authorization to adjust its pre-existing policies or regulations. Congressional imposition of a rate that is out of line with economic reality (in a case concerning the composite rate for end-stage renal disease services) "does not give HCFA the right to justify using out-of-line-with-reality component numbers to make exception determinations." University of Cincinnati, d/b/a University Hospital v. Shalala, 867 F. Supp. 1325 (S.D. Ohio, Nov. 8, 1994).

Because HCFA Pub. 15-1 §2534.5 carves out a *per se* exception methodology contained in the applicable regulation and in the unwritten policy of CMS for 15 years prior to adoption of this manual section, it "effected a change in existing law or policy" that is substantive in nature. Linoz v. Heckler, 800 F.2d 871,877 (9th Cir. 1986).

Even if HCFA Pub. 15-1 §2534.5 should be considered an "interpretive" rule, it nevertheless constitutes a significant revision of the Secretary's definitive interpretation of 42 C.F.R. §413.30 and is invalid because it was not issued pursuant to notice and comment rulemaking. "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and rulemaking." Paralyzed Veterans of America v. D.C. Arena L.P., 117 F.3d 579, 586 (D.C. Cir. 1997).

In a District of Columbia Circuit Court decision, Alaska Professional Hunters Ass'n., Inc. v. Federal Aviation Admin., 177 F.3d 1030, 1034 (D.C. Cir. 1999), the Court held: "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." Without question, that is precisely what CMS did when it changed its methodology of determining atypical services exceptions for hospital-based SNFs after having consistently applied it in a much different manner for 15 years prior to making the change.

There is nothing in the statute or regulation that requires the "gap" methodology interpretation at issue here. Congress gave the Secretary broad authority to establish "by regulation" the methods to be used and items to be included in determining

reimbursement. 42 U.S.C. §1395 x(v)(1)(A). Had the "gap" methodology been subjected to the rulemaking process under the APA, 5 U.S.C. §553, it would have been a legitimate exercise of that power. However, it was not, and, in addition to the arguments previously presented, the Board is further persuaded by the District Court's decision in the St. Luke's case that HCFA Pub. 15-1§2534.5 does not reasonably interpret 42 C.F.R. §413.30.

The St. Luke's Court found HCFA Pub. 15-1 §2534.5 "invalid as an unreasonable interpretation of 42 C.F.R. §413.30 in light of the language of that regulation and the principles underlying the Medicare statute." The Court reasoned that HCFA Pub. 15-1 §2534.5 created an irrefutable exclusion of gap costs that, if permitted to stand, would allow the Secretary to "substantively rewrite the regulation to impose an additional hurdle for exceptions eligibility not clearly contemplated by the language of 42 C.F.R. §413.30(f) or subsequently enacted statutes."[6] The Court also found that application of the "gap" methodology would result in non-Medicare payors subsidizing the care of Medicare patients in violation of 42 U.S.C. §1395x(v)(1)(A).

The St. Luke's Court stated that:

> [t]he Court does not agree that 42 U.S.C. §1395yy, read in conjunction with 42 C.F.R. §413.30, reasonably results in the interpretation promulgated by the Secretary in PRM [HCFA] Pub. 15-1 §2534.5. There is no inherent conflict between the Secretary's original, longstanding interpretation of 42 C.F.R. §413.30 and Congress' subsequent imposition of a two-tiered RCL [reasonable cost limit] measure through 42 U.S.C. §1395yy. Absent persuasive evidence to the contrary, there is no reason to believe that Congress, in enacting 42 U.S.C. §1395yy, meant to override the distinction between typical and atypical service reimbursement eligibility explicitly recognized in 42 C.F.R. §413.30.

St. Lukes at 787.

The Court also determined that HCFA Pub. 15-1 §2534.5 represents:

> . . . an abrupt and significant alteration of a longstanding, consistently followed policy and was developed years after the regulation it interprets and the statute it purports to incorporate. The Secretary has failed to persuade this Court that despite its incongruous and inconsistent

---

[6] The Secretary argued that his rational for the "gap" methodology was based on legislative changes to the statute in 1984 in which 112% of the mean was used to calculate new cost limits. There were no changes to the statute or regulation concerning the exemption process, however.

procedural history, the interpretation is the product of
"thorough and reasoned consideration."

<u>St. Lukes</u> at 781.

The findings and decision of the St. Luke's Court are equally applicable to the present
case and support the Board's conclusion that the partial denial of the Provider's request
for an exception to the SNF cost limit should be revised to permit the Provider to recover
its costs.

DECISION AND ORDER:

CMS' methodology for determining the amount of the Provider's exception to the
hospital-based SNF cost limits was improper.  The Provider is entitled to be reimbursed
for all of its costs above the cost limit as opposed to being reimbursed only for its costs
that exceeded 112 percent of the peer group's mean per diem costs.

Board Members Participating:

Suzanne Cochran, Esq.
Dr. Gary B. Blodgett
Elaine Crews Powell, C.P.A
Anjali Mulchandani-West
Yvette C. Hayes

DATE:  August 14, 2007

FOR THE BOARD:

Suzanne Cochran, Esq.
Chairman

**Exhibit B**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176  Facsimile 410-786-0043



**Office of the Attorney Advisor**

**VIA CERTIFIED MAIL**

OCT 1 6 2007

Dennis M. Barry, Esquire
Vinson & Elkins, LLP
The Willard Office Building
1455 Pennsylvania Avenue, Suite 600
Washington, DC 20004-1008

RECEIVED

OCT 1 8 2007

VINSON & ELKINS

Re:  Montefiore Medical Center, PRRB Decision No. 2007-D61

Dear Mr. Barry:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board.  This constitutes the final administrative decision of the

Secretary of the Health and Human Services.  Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc:  Arthur E. Peabody, Jr., Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| In the case of: | Claim for: |
|---|---|
| **Montefiore Medical Center** | **Provider Cost Reimbursement Determination for Cost Year Ending: December 31, 1990** |
| Provider | |
| vs. | **Review of:** |
| **BlueCross BlueShield Association/ National Government Services- NY** | **PRRB Dec. No. 2007-D61** |
| Intermediary | **Dated: August 14, 2007** |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period mandated in § 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The parties were notified of the Administrator's intention to review the Board's decision. The Provider submitted comments, requesting that the Administrator affirm the Board's decision. CMS' Centers for Medicare Management (CMM) submitted comments requesting that the Administrator reverse the Board's decision. The Intermediary submitted comments requesting that the Administrator reverse the Board's decision. Accordingly, this case is now before the Administrator for final agency review.

## BACKGROUND

The Provider operated a hospital-based skilled nursing facility (SNF) during the Provider's fiscal year ending (FYE) 12/30/90. The Provider requested an exception from the SNF routine cost limits (RCLs), on the basis that it furnished atypical services.[1] The Provider reviewed the request and forwarded it to CMS, where it was approved. The Intermediary calculated the amount of the exception

---

[1] See Provider's Position Paper. Exhibit P-3.

based upon program instructions in Section 2534 of the Provider Reimbursement Manual (PRM), which direct intermediaries to calculate cost limit exception for hospital-based SNFs at amounts exceeding 112 percent of the mean per diem routine service costs for hospital-based SNFs. The Provider timely appealed this methodology to the Board, arguing it should be reimbursed all of its costs in excess of the limit.

## ISSUE AND BOARD'S DECISIONS

The issue before the Board was whether the Intermediary improperly limited the Provider's hospital-based SNF routine cost limit exception amount to costs in excess of 112 percent of its peer group costs rather than costs in excess of the RCL.

Citing its decision in Hi-Desert Medical Center,[2] the Board found that the methodology applied by CMS in partially denying the Provider's exception request for per diem costs that exceeded the cost limit was not consistent with the statute and regulations. The Board stated that the regulation at 42 CFR 413.30(f)(1) permits the Provider to request from CMS, an exception to the cost limit because it provided atypical services. The Board found that, for fifteen years, the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the cost limits if the provider demonstrated that it met the exception requirements. The Provider's exception request was processed in accordance with § 2534.5 of the PRM[3] issued in July 1994. That section states that the atypical services exception of every hospital-based SNF must be measured from 112 percent of the peer group mean for that hospital-based SNF rather than the SNF's limit.

Thus, the Board continued, for the purpose of determining the atypical services exception for hospital-based SNFs, CMS replaced the limit with a new "cost limit," i.e., 112 percent of the peer group mean routine services cost. It is also undisputed, the Board stated, that 112 percent of the peer group mean of hospital-based SNFs is significantly higher than the routine cost limit. Thus, under § 2534.5 of the PRM, a reimbursement "gap" is created between the limit and 112 percent of the peer group mean that represents costs incurred by a hospital-based SNF, which it is not allowed to recover.

---

[2]  Hi-Desert Medical Center v. United Government Services/Blue Cross Blue Shield Association, PRRB Dec. No. 2007-D17, February 2, 2007, rev'd, CMS Administrator, April 2, 2007.
[3]  See HCFA [now CMS] Transmittal No. 378.

The Board stated that, in creating this reimbursement gap, CMS misinterpreted the intent of Congress, and the policy represents a substantive policy change from CMS' prior interpretation of § 413.30(f)(1). The Board observed that the only limit intended by Congress and imposed by the plain language of the statute and regulation is the cost limit. To qualify for an atypical services exception, a provider must demonstrate that the "actual cost of items and services furnished by a provider exceeds the applicable limit because such items are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified." The Board noted that CMS did not dispute the fact that the Provider was furnishing atypical services and would have been entitled to the exception but for the "methodology described."

The Board found that the regulation states that the provider must only show that its cost "exceeds the applicable limit," not that its cost exceeds 112 percent of the peer group mean. The Board stated that the regulatory comparison to a peer group of "providers similarly classified" referred to the "nature and scope of the items and services actually furnished," not of their cost.

Moreover, the Board continued, Congress established the four peer groups to be considered in determining Medicare reimbursement of SNFs: free-standing urban, free-standing rural, hospital-based urban, and hospital-based rural. There was no statutory or regulatory authority granted to CMS to establish a new peer group for hospital-based SNFs, i.e., 112 percent of the peer group mean routine service cost, and to determine atypical service exceptions from a new cost limit rather than from the Congressionally intended limit.

The Board also found that the provisions of § 2534.5 of the PRM referring to the 112 percent requirement are invalid because they were not adopted pursuant to the notice and comment requirements of § 553 of the Administrative Procedure Act (APA). The Board stated that this case is a departure from CMS' earlier method of determining hospital-based SNF exception requests, and therefore, requires an explanation for such a change. Section 1888 of the Act only set the formula for determining the cost limit. It did not change the method to be used to determine exceptions, nor did it provide CMS with authorization to adjust its pre-existing policies or regulations.

Further, the Board cited a court decision to support the principle that, because § 2534.5 of the PRM carves out a per se exception methodology contained in the applicable regulation and in the unwritten policy of CMS for fifteen years prior to adoption of § 2534.5, it "effect[ed] a change in existing law or policy'" that is

substantive in nature.[4]    The Board found that, even if § 2534.5 is considered interpretive, it nevertheless constitutes a significant revision of the Secretary's definitive interpretations of 42 CFR §413.30 and is invalid because it was not issued pursuant to the APA's notice and comment rulemaking.[5]

In addition, the Board found that there is nothing in the statute or regulation that requires the "gap" methodology interpretation at issue.    Pursuant to § 1861(v)(1)(A) of the Act, Congress gave the Secretary broad authority to create regulations establishing the methods to be used and items to be included in determining reimbursement.  If the gap methodology had been subjected to the APA rulemaking process, the Board stated that it would have been a legitimate exercise of that authority, but it was not, and in addition to the previous arguments herein, the Board stated that it was further persuaded by the District Court's decision in St. Luke's Methodist Hospital v. Thompson[6] that § 2534.5 does not reasonably interpret § 413.30, and was a substantive rewrite of the regulation which imposed another requirement for exceptions.  The court also found that application of the gap methodology would result in non-Medicare payors subsidizing the care of Medicare patients in violation of § 1861(v)(1)(A).  The Board found that the court ruling in St. Luke's is equally applicable to the present case and supports the Board's conclusion that the partial denial of the Provider's request for an exception to the SNF cost limits should be revised to permit the Provider to recover its costs.

## SUMMARY OF COMMENTS

CMM submitted comments requesting that the Administrator review the Board's decision.  CMM explained that § 223 of the Social Security Amendments of 1972 (Pub. Law 92-603) authorized the Secretary to establish RCLs as a presumptive test of reasonable costs, with exceptions where necessary.  The general authority for the procedures for establishing the RCLs and the exception process is set forth in the regulation at 42 CFR § 413.30.

Prior to issuing the first set of cost limits, effective October 1, 1979, CMS recognized that the average per diem costs of hospital-based SNFs were higher than those of free-standing SNFs.  CMS recognized the cost differences between hospital-based and free-standing facilities, and established separate cost limits for

---

[4] Linoz v. Heckler, 800 F.2d 871, 877 (9th Cir. 1986).
[5] The Board cited to Paralyzed Veterans of America v. D.C. Area, 117 F.3d 579, 586 (D.C. Cir. 1997) and Alaska Professional Hunters Ass'n, Inc v. Federal Aviation Admin., 177 F.3d 1030, 1034 (D.C. Cir. 1999).
[6] 182 F. Supp. 2d 765 (N.D. Iowa 2001), aff'd 315 F.3d 984 (8th Cir. 2003).

different classifications, or peer groups, of SNFs. CMS observed, however, that studies were needed to determine the reasons for the cost differences, especially where differences may be related to the Medicare cost allocation process and variation in intensity of care.[7]

CMM explained that Congress also began to address the issue of cost differences between hospital-based SNFs and free-standing SNFs. In the belief that no cost differences should be recognized and in the absence of data to show otherwise, Congress enacted the Tax Equity and Fiscal Responsibility Act (TEFRA) in 1982, mandating the same RCLs for hospital-based SNFs and free-standing SNFs based on free-standing SNF costs. This provision, however, was repealed and separate limits were reestablished until further studies were performed. Several studies were undertaken in 1983 and 1984, and reported in 1985, concluding that approximately 50 percent of the cost differences were attributable to variations in intensity of care, or case mix. There were indications that the Medicare Cost allocation process represented a small portion of the cost differences. Since none of the other variables tested were significant, inefficiency remained as a possible cause of the cost differences.

CMM stated that §1888 of the Act was enacted as part of the Deficit Reduction Act of 1984 (DEFRA) as a result of these studies. Section 1888 recognized 50 percent of the cost differences between hospital-based SNFs and free-standing SNFs in setting the hospital-based SNF RCLs. Under §1888(a), the free-standing SNF RCLs are set at 112 percent of mean per diem costs of free-standing SNFs (their peer group mean per diem costs), whereas the hospital-based SNF RCLs are computed by adding 50 percent of the cost differences between hospital-based SNFs and free-standing SNFs to the appropriate free-standing SNF RCL. In addition, §1888(b) mandated that any cost differences related to the Medicare cost allocation process would be recognized. Any remaining cost differences were not recognized as reasonable costs in setting the hospital-based SNF RCLs.

CMM stated that §1888(c) of the Act sets forth the Secretary's authority to make adjustments in the RCLs based upon case-mix or circumstances beyond the control of a facility. Pursuant to the statute, the regulations at 42 CFR §413.30(f) allow for adjustments to the RCLs only to the extent that costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.

CMM explained that the first step of the exception process is to determine if costs exceeding the applicable RCL are reasonable. CMM observed that §1888 of the

---

[7] 44 Fed. Reg. 51542 (Aug. 31, 1979).

Act, related legislative documentation, and the studies which identified legitimate cost differences in setting the hospital-based SNF RCLs, guided the policy not to deem the remaining cost differences, that is, those costs between the hospital-based cost limit and 112 percent of the hospital-based peer group mean costs, as reasonable. Accordingly, these costs are removed from the provider's costs in excess of the limit before advancing in the exception process.

CMM continued that the second step of the exception process of attributing the remaining costs in excess of the limit to the circumstances specified mandates that "actual costs of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified…" The regulation is further interpreted by the PRM which states that the maximum amount of an exception is the amount by which a SNF's costs exceed those of the peer group. The peer groupings are similar to those used to establish the limits. The peer group costs are based on 112 percent of the mean per diem costs of freestanding/urban, rural or hospital-based/urban, rural SNFs as appropriate.

In summary, CMM stated that the policy published in Chapter 25 of the PRM is a reasonable interpretation of the statute and implementing regulations. Furthermore, at least one Court of Appeals and three district courts have rejected the very claims the Provider makes here.[8] In addition, CMM pointed out that over the years of implementing the provisions of Chapter 25 of the PRM, the Congress never introduced legislation that directed CMS to recognize any of the "gap" amount as reasonable through the exception process. Moreover, when replacing the cost limit payment system with the SNF prospective payment system (PPS) in 1998, the Congress did not recognize a substantial portion of hospital-based SNF costs by establishing a single Federal rate for both freestanding and hospital-based SNFs as an average of the average costs for freestanding and the average costs for all facilities combined (see §1888 of the Act and §413.337(b)(5) of the regulations). Thus, under the current SNF PPS, the Congress recognizes an amount far less than 50 percent of the difference between hospital-based and freestanding costs recognized under the cost limit payment system.

---

[8] See St. Francis Health Care Centre v. Shalala, 205 F.3d 937 (6th Cir. 2000); San Joaquin Community Hosp. v. Thompson, No. Civ F 01-5733 (E.D. Cal. Aug. 13, 2002); Fort Bend Cmty. Hosp. v. Thompson, No. H-00-4020 (Mar. 22, 2002) (adopting Magistrate Judge's recommendation); Cannonsburg General Hosp. v. Thompson, No. 00-0284 (W.D. Pa. Feb. 28, 2001).

The Intermediary submitted comments recommending that the Administrator reverse the Board's decision because the amount of the exception was properly calculated in accordance with HCFA Pub. 15-1 §2534.5.[9]

The Provider submitted comments requesting the Administrator affirm the Board's decision. The Provider argued that the Board decision is correct, consistent with applicable regulations, and conforming to court interpretations of the law, and that it was relying upon the arguments made in its position papers and in the hearings.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. The Administrator has reviewed the Board's decision. All comments timely received have been considered and included in the record.

During the cost year at issue, Medicare reimbursed for services provided in SNFs largely on the basis of reasonable cost as defined by § 1861(v)(1) of the Act. In addition, § 1861(v)(1)(A) sets forth the requirement that Medicare shall not pay for costs incurred by non-Medicare beneficiaries and vice-versa, i.e., Medicare prohibits cross-subsidization of costs.

Section 1861(v)(1)(A) also authorizes the Secretary to establish limits on the allowable costs incurred by providers of health care services. The limits are based on estimates of the costs necessary for the efficient delivery of needed health care services. The limits on inpatient general routine service costs set forth at § 1861(v)(1)(A) apply to SNF inpatient routine costs, excluding capital-related costs. Rather than defining reasonable cost with precision, § 1861(v)(1)(A) authorizes the Secretary to issue appropriate regulations setting forth the methods to be used in computing such costs. The regulations at 42 CFR § 413.9 establish that the determination of reasonable costs must be based on costs related to the care of Medicare beneficiaries. If the provider's costs include amounts not related to

---

[9] The Intermediary also recommended that the Board's decision be reversed on jurisdictional grounds, based on the fact that the Provider appealed from the original NPR, which did not include any exception to the RCL. The Provider did not appeal the revised NPR, which included the RCL exception amount. The regulation at 42 CFR § 413.30(c), states that the time for CMS to review the exception is good cause for late filing an appeal with the Board. This language would indicate that CMS anticipates that the appeal would be pursuant to the NPR that is the subject of the exception request.

patient care, or costs that are specifically not reimbursable under the program, those costs will not be paid by the Medicare program. Further, 42 CFR § 413.9(b) provides that the reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used and the items to be included.

The regulations codified at 42 CFR § 413.30, et seq. implement the cost limit provisions of § 1861(v)(1) of the Act. Prior to 1972, the regulations contemplated reimbursement of the entirety of a provider's services to Medicare patients unless its costs were found to be substantially out of line with those of similar institutions.

In 1972, in response to rising costs and recognizing that the original Medicare payment structure provided little incentive for providers to operate efficiently in delivering services,[10] Congress amended the statute, specifying that reasonable costs meant only those "actually incurred, excluding therefrom any part of incurred cost[s] found to be unnecessary in the efficient delivery of needed health services." Additionally, Congress authorized the Secretary to "provide for the establishment of limits... based on estimates of the costs necessary in the efficient delivery of needed health services" under § 223 of the Social Security Amendments of 1972.[11] The § 223 cost limits were to reflect the maximum expenses incurred by an efficient provider; costs exceeding the limits would be presumed unreasonable and not be allowed unless pursuant to an exception.[12]

Section 223 cost limits for SNFs were first implemented on October 1, 1979. Pursuant to § 1861(v)(1)(A) of the Act, CMS promulgated yearly schedules of limits on SNF inpatient routine service costs and notified participating providers of the exceptions process in the Federal Register.[13] Beginning with the initial implementation of § 223 limits on SNF inpatient routine costs, separate reimbursement limits were derived for hospital-based SNFs and free-standing SNFs on the basis of the cost reports submitted by the two types of providers. These separate limits were implemented because hospital-based SNFs maintained that they incurred higher costs because of the allocation of overhead costs required

---

[10] See H.R. Rep. No. 92-231 at 82-85 (1971); S. Rep. No. 92-1230 at 188-89 (1972).

[11] Pub. L. No. 92-603.

[12] S. Rep. No. 92-603.

[13] See e.g., 42 Fed. Reg. 36.237 (1976); 44 Fed. Reg. 29.362(1979); 44 Fed. Reg. 51,542 (1979); 45 Fed. Reg. 58.699 (1980); 46 Fed. Reg. 48.026(1981); 47 Fed. Reg. 42.894 (1982).

by Medicare and higher intensity of care.[14]  Of note, effective for cost reporting periods beginning on or after October 1, 1980, these cost limits were based on 112 percent of the average per diem costs of each comparison group.[15]

Section 102 of TERFA eliminated separate limits for hospital-based SNFs and free-standing SNFs, mandating single limits based on the lower costs of free-standing SNFs, subject to appropriate adjustments.[16]  However, the single limits based on the lower costs of the free-standing SNFs were never implemented. Section 2319 of DEFRA of 1984 rescinded the single TEFRA limit for SNFs and directed the Secretary to set separate limits on per diem inpatient routine service costs for hospital-based SNFs and free-standing SNFs, revising § 1861(v) of the Act and adding a new § 1888 to the Act.[17]  Section 1888(a) specifies the methodology for determining the separate cost limits rather than delegating authority to the Secretary to do so by regulation.  Under § 1888(a), the RCLs are determined based on per diem limits, which are equal to a percentage of the mean per diem inpatient routine service costs of free-standing or hospital-based facilities (qualified by whether the facility is urban or rural).  The basis for computing the RCLs for both free-standing SNFs and hospital-based SNFs is the amount of the free-standing SNF RCL; the RCL for the higher cost hospital-based SNFs is computed with an add-on to the free-standing SNF RCL.  Section 1888(a) states that:

> The Secretary, in determining the amount of the payments which may be made under this title with respect to routine service costs of extended care services[,] shall not recognize as reasonable (in the efficient delivery of health services)[,] per diem costs of such services to the extent that such per diem costs exceed the following per diem limit...: (1) [and (2)] With respect to freestanding skilled nursing facilities...., the limit shall be equal to 112 percent of the

---

[14]  See HCFA, Report to Congress on the Study of the Skilled Nursing Facility Benefit under Medicare at 99 (1985).

[15]  See e.g., 45 Fed. Reg. 58,699 (1980); 46 Fed. Reg. 48,026 (1981); 47 Fed. Reg. 42,894 (1982).  See also 51 Fed. Reg. 11,234 (1986) (Prior to the schedule of ... single limits were calculated at 112 percent of the mean of the routine costs for freestanding and hospital-based SNFs, respectively.  Further, the routine costs considered for each comparison group were the routine costs attributable to the particular group..." Id.).

[16]  TEFRA of 1982, Pub. L. No. 97-248.  See 47 Fed. Reg. 42,894(1982).

[17]  Deficit Reduction Act of 1984, Pub. L. No. 98-369 (Medicare and Medicaid Budget Reconciliation Amendments of 1984), applicable as provided in § 2319(c) and (d) of the amendments.  See also § 2530, et. seq. of the PRM.

mean per diem routine service costs for freestanding skilled nursing facilities… (3) [and(4)] With respect to hospital-based skilled nursing facilities…, the limit shall be equal to the sum of the limit for freestanding skilled nursing facilities…, plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities… exceeds the limit for freestanding skilled nursing facilities…

Subsection (b) of the new § 1888 also provided for a mandatory add-on to recognize the cost differences between hospital-based and freestanding SNFs attributable to excess overhead allocations, i.e. for the administrative and general costs of hospital-based SNFs. This add-on was mandated by Congress due to recognition of the fact that the required method of allocating overhead costs to SNF cost centers may result in a higher cost for hospital-based SNFs.

In summary, under TEFRA, for cost reporting periods beginning on or after October 1, 1982 and before July 1, 1984, the cost limits for routine services for the hospital-based SNFs and free-standing SNFs were to have been 112 percent of the mean inpatient routine service per diem costs for free-standing SNFs, the lower cost group. However, because the TEFRA provisions never became effective, there were separate limits during that period for hospital-based SNFs and free-standing SNFs based upon 112 percent of their respective mean peer group cost. For cost reporting periods beginning after July 1, 1984, including the cost reporting periods at issue in this case, the RCLs for free-standing SNFs remained at 112 percent of the mean peer group inpatient routine service per diem costs. For those same cost reporting periods, Congress dictated that the RCLs for hospital-based SNFs would equal the free-standing RCL plus 50 percent of the difference between 112 percent of the mean peer group inpatient routine service per diem costs and the free-standing RCL, plus the add-on required in § 1888(b). In short, DEFRA rejected the concept of a single set of RCLs for SNFs and established a somewhat more generous reimbursement for hospital-based SNFs as compared to free-standing SNFs. The hospital-based SNF RCLs are set at an amount halfway between the free-standing SNF RCLs, which are 112 percent of the free-standing peer group mean per diem costs, and an amount less than what would be an amount directly corresponding to the free-standing RCLs using the peer comparison, i.e., 112 percent of the hospital-based SNF peer group mean per diem costs.

Under DEFRA provisions, the Secretary was also given broad discretion to authorize adjustments to the cost limits. Section 1888(c) provides:

The Secretary may make adjustments in the limits set forth in subsection (a) with respect to any skilled nursing facility to the extent the Secretary deems appropriate, based upon case mix or circumstances beyond the control of the facility. The Secretary shall publish the data and criteria to be used for purposes of this subsection on an annual basis.

In accordance with the foregoing provisions of § 1861(v)(1)(A), as amended, and § 1888, the regulations at 42 C.F.R. § 413.30 specify the process by which CMS would establish limits on providers' routine costs and allow for various adjustments.[18] Further, in accordance with § 1888(c) of the Act, 42 CFR § 413.30(f) provides for exceptions to the cost limits to the extent that costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary. Pertinent to this case, § 413.30(f)(1) specifically provides for an exception for atypical services:

---

[18] The Administrator notes that CMS has published schedules of limits in the Federal Register, which outline the methodology and data used to determine the costs on which the RCLs are based. See also § 2530.4 of the PRM. The methodology for determining the RCLs, pursuant to DEFRA, for hospital-based SNFs was first described in an April 1, 1986 notice of the schedule of limits. 51 Fed. Reg. 11234, 11237, 11253. See also 52 Fed. Reg. 37,098, 37,099 (Oct. 2, 1987); 56 Fed. Reg. 13,317 (Apr. 1, 1991). CMS explained that it was publishing a revised schedule of limits for cost reporting periods beginning on or after July 1, 1984 in conformity with § 2319 of DEFRA. The notice explained that DEFRA required that separate RCL limits apply to hospital-based SNFs and free-standing SNFs; the RCL for hospital-based SNFs were required to be equal to the RCLs for corresponding free-standing SNFs plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based SNFs exceed the corresponding limit, i.e., the RCL for corresponding free-standing SNFs.

The schedule of limits effective for cost reporting periods beginning on or after October 1, 1989 is applicable to the cost years at issue in this case. For those cost reporting periods, the hospital-based SNF RCLs continued to be equal to the free-standing RCLs (112 percent of the average labor related and average nonlabor-related costs) plus 50 percent of the difference between the mean peer group per diem routine service costs of hospital-based SNFs and the free-standing SNF RCLs, i.e., higher than the free-standing cost limits, set at 112 percent of the free-standing peer group mean cost, but lower than 112 percent of the hospital-based peer group mean cost. 56 Fed. Reg. 13,317 (Apr. 1, 1991).

> The provider can show that the – (i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and (ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary on the efficient delivery of needed heath care.

Consistent with the statute and regulations, CMS set forth the general provisions concerning payment rates for certain SNFs in Chapter 25 of the PRM. In July 1994, to provide the public with current information on the SNF cost limits under § 1888 of the Act, CMS issued Transmittal No. 378.[19] Prior to the issuance of Transmittal No. 378, Chapter 25 of the PRM did not address the methodology used to determine exception requests. Transmittal No. 378 explained that new manual sections, at § 2530, et seq., were being issued to "provide detailed instructions for skilled nursing facilities (SNFs) to help them prepare and submit requests for exceptions to the inpatient routine service cost limits."

Section 2534.5, as adopted in Transmittal No. 378, "Determination of Reasonable Costs in Excess of Cost Limit or 112 Percent of Mean Cost," explains the process and methodology for determining an exception request based on atypical services. In determining reasonable costs, a provider's costs are first subject to a test for low occupancy and then are compared to per diem costs of a peer group of similarly classified providers. Section 2534.5B of the PRM explains the methodology CMS developed to quantify the peer group comparison that is part of the test for reasonableness:

> Uniform National Peer Group Comparison. – The uniform national peer group data are based on data from SNFs whose costs are used to compute the cost limits. The peer group data are divided into four groups: Urban Hospital-based, Urban Freestanding, Rural Hospital-based, and Rural Freestanding. For each group, an average per diem cost (less capital-related costs) is computed for each routine service cost center (direct and indirect) that the provider reported on its Medicare cost report. For each cost center, a ratio is computed as the average per diem cost to total per diem cost. Those cost centers not utilized on the Medicare cost report must be eliminated and all ratios are revised based on the revised total per diem cost...

---

[19] Transmittal No. 378 also rendered §§ 2520-2527.4 of the PRM, adopted in July 1975, under Transmittal No. 129, as obsolete.

With cost reporting periods beginning prior to July 1, 1984, for each freestanding group and each hospital-based group, each cost center's ratio is applied to the cost limit applicable to the cost reporting period for which the exception is requested. For each hospital-based group with cost reporting periods beginning on or after July 1, 1984, the ratio is applied at 112 percent of the group's mean per diem cost (not the cost limit), adjusted by the wage index and cost reporting year adjustment factor applicable to the cost reporting period for which the exception is requested. The result is the Provider's per diem cost is disaggregated into the same proportion of its peer group mean per diem cost for each cost center.

The SNF's annual per diem cost or, if applicable, the cost as adjusted for low occupancy for each applicable routine cost center (less capital-related costs) is compared to the appropriate component of the disaggregated cost limit or 112 percent of the hospital-based mean per diem cost. If the SNF's per diem cost exceeds the peer group per diem cost for any cost center, the higher cost must be explained. Excess per diem costs which are not attributable to the circumstances upon which the exception is requested and cannot be justified may result in either a reduction to the amount of the exception or a denial of the exception.

Contrary to the Board's findings, the Administrator finds that the exception guidelines in Chapter 25 of the PRM are reasonable and appropriate, as they closely adhere to the requirements of § 1888(a) of the Act and are within the scope of the Secretary's discretionary authority under § 1888(c) of the Act to make adjustments in the SNF RCLs, and under the implementing regulations at § 413.30(f)(1)(i). The Administrator rejects the Board's view that § 1888(a) of the Act and the implementing regulation at 42 CFR § 413.30 entitle all SNFs to be paid the full amount by which their costs exceed the applicable RCL.

Of particular relevance to this case, the regulation at § 413.30(f) specifically requires a reasonableness determination in granting an exception request:

Exceptions: Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary. [Emphasis added.]

In contrast to the Board, the Administrator finds that the policy interpretation in §
2543.5B, requiring the hospital-based SNF costs to be compared to 112 percent of
the group's mean per diem costs, is an appropriate method of applying the
reasonable cost requirements and is not inequitable.  Relevant to the reasonable
cost determination, in the case of free-standing SNFs, Congress set the RCLs at the
peer group mean costs.[20]  In the case of hospital-based SNFs, Congress determined
it appropriate to set the cost limits at an amount less than the peer group mean
costs.  Congress believed there to be no adequate justification for the higher mean
per diem costs of hospital-based SNFs relative to free-standing SNFs, other than
the possibility that higher hospital-based SNF costs are due to inefficiencies.
Thus, as validated by its Report to Congress,[21] CMS properly determined, in
developing the exception process, that 50 percent of the difference between the
free-standing SNF and the hospital-based SNF cost limits, i.e., the "gap," was due
to hospital-based SNFs' inefficiencies.  As such costs are not reasonable, CMS
properly determined that these costs could not be reimbursed pursuant to the
exception process.

Moreover, the plain language of § 413.30(f)(1)(i) supports the use of a peer group
comparison such as that made under the methodology set forth in § 2534.5B of the
PRM to determine both reasonableness and atypicality.  The regulation at 42 CFR
413.30(f)(1)(i) establishes that a provider must show that the:

> Actual cost of items or services furnished by a provider exceeds the
> applicable limit because such items or services are atypical in nature
> and scope, compared to the items or services generally furnished by
> providers similarly classified.

Thus, the policy set forth in the regulation requires examination of both the
reasonableness of the amount that a provider's actual costs exceed the applicable

---

[20] Both Congress and CMS have used 112 percent of, or one standard deviation
from, the mean to establish the range of reasonable costs.  See, e.g., § 1861(v)(1)
(home health agency cost limits); 57 Fed. Reg. 23,618, 23,635 (June 4, 1992)
(explaining that the 108 percent threshold for a wage index reclassification is
based on the average hospital wage as a percentage of its area wage (96 percent)
plus one standard deviation (112 percent); 58 Fed. Reg. 46,270, 46,286 (Sep. 1,
1993) and 60 Fed. Reg. 45,778, 45,780 (Sep. 1, 1995)(using standard deviation in
establishing diagnosis-related group value).  The standard deviation is a statistical
measure of data about a mean value.  See also, e.g., 60 Fed. Reg. 35,854, 35,862
(1995).
[21] HCFA, Report to Congress on the Study of the Skilled Nursing Facility Benefit
under Medicare at 99 (1985).

cost limits and the determination of the atypicality of the costs by using a peer group comparison, i.e., the 112 percent threshold. If a hospital-based SNF can establish that its costs are reasonable and atypical in relation to its peer group, the provider then has the opportunity to demonstrate that, inter alia, its atypical costs are related to the special needs of its patients. The Administrator finds that use of this methodology is appropriate and a valid exercise of the Secretary's discretion under § 1888(c) of the Act to make adjustments to the RCLs. In the Administrator's view, CMS properly applied a test of the reasonableness of the amount of the costs in excess of the cost limits claimed to be due to the atypical services based on the 112 percent of the per diem mean for hospital-based SNFs.

Additionally, § 13503(a) of the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66) made several changes to §1888 of the Social Security Act. Most notably, this provision repealed the excess overhead allocations for hospital-based facilities which had been set forth at §1888(b). Instead of requiring the Secretary to "recognize as reasonable the portion of the cost differences between hospital-based and freestanding skilled nursing facilities attributable to excess overhead allocations", Congress now mandated that the Secretary may not recognize those costs as reasonable. This add-on had been part of the 50 percent of the cost differences between hospital-based and freestanding SNFs that was considered to be due to excess overhead allocations and inefficiencies of hospital-based SNFs. Thus, it is not unreasonable for CMS to further conclude that the inefficiencies should also not be recognized as reasonable, and should not be paid pursuant to the exception methodology. If CMS were to allow exceptions for hospital-based SNFs for costs that fell within the "gap" between the routine cost limit and 112 percent of the peer group mean, it would be paying those very costs which are not recognized as reasonable and which Congress has specifically instructed it not to pay.

Furthermore, the Administrator finds use of the methodology set forth in § 2534.5B of the PRM in no way alters or revises Medicare policy as set forth in the regulations at § 413.30(f)(1)(i) but is one method of applying that policy. Indeed, § 2534.5B did not effect a change in CMS policy.[22] Although Congress changed the RCLs for hospital-based SNFs in 1984, the published cost limits since 1980[23]

---

[22] The record in this case does not support the Board's finding that CMS had changed policy.

[23] 45 Fed. Reg. 41,292 (1980) ("We are proposing that the limits be set at 112 percent of each group's mean cost. We believe that the 12 percent allowance above mean cost is a reasonable margin factor in view of the refinements made in the method used to establish the limits."); 45 Fed. Reg. 58,699 (1980) ("[l]imits set

reflect that CMS had previously used a methodology under which the SNFs' per diem costs were compared to a percentage of the peer group mean per diem cost.[24]

Notably, § 2534.5B refers to the "cost limit" limit rather than to 112 percent of a SNF's peer group mean per diem cost, only where the terms are interchangeable, i.e., where the cost limit is equal to 112 percent of the SNF's peer group mean cost. For periods prior to the effective date of the hospital-based SNF RCL under DEFRA, July 1, 1984, the term, "112 percent of the peer group mean per diem cost" was synonymous with the term, "cost limit," for both free-standing SNFs and hospital-based SNFs. After June 1984, the free-standing SNF RCL remained at 112 percent of the peer group mean per diem cost. However, as explained above, Congress changed the amount of the hospital-based SNF RCL. Thus, § 2534.5B uses the term of cost limit to refer to 112 percent of the free-standing SNF mean per diem cost, but cannot use the same term for the hospital-based SNFs. Section 2534.5B simply recognizes that, after July 1, 1984, the term of cost limit can no longer be used interchangeably with the term of 112 percent of the peer group mean per diem cost for hospital-based SNFs. In short, although the statutory cost limit for hospital-based SNFs was changed under DEFRA, that change did not impact CMS' peer group methodology.

Thus, the Administrator also disagrees with the Board's finding that the methodology for determining an exception for atypical services of a hospital-based SNF using the uniform peer group comparison, as set forth in § 2534.5 of the PRM, constituted a change in policy requiring notice and comment rule-making under 5 USC 552. First, as noted, CMS has consistently compared SNF costs to their comparison group in applying the cost limits. The Administrator finds that the methodology at issue does not involve application of a "substantive" rule requiring publication of notice and comment under the APA. The Secretary has broad authority to promulgate regulations under §§ 1861(v)(1)(A) and 1888 of the Act. Relevant to this case, the Secretary has promulgated a regulation at § 413.30(f)(1) establishing a specific exception from the RCLs based on atypical services. The Secretary does not have an obligation to promulgate regulations that

---

at 112 percent of the average per diem labor-related and nonlabor costs of each comparison group." Id.) 46 Fed. Reg. 48,026 ('981); 51 Fed. Reg. 11,234 (1986).

[24] See, e.g., 44 Fed. Reg. 51,542, 51,544 (Aug. 31, 1979) ("We believe the use of a limit based on the average to be superior to a percentile limit. The average is a good measure of the cost incurred in the efficient delivery of services by peer providers.... Since these are the first limits we have established for SNFs, the methodology used does not account for any conceivable variable which could affect SNF costs. As we gain information and experience, the methodology will be refined.")

specifically address every conceivable situation in the process of determining reasonable costs.[25] Rather, the Intermediary is required to make a determination of the reasonableness of the exception request, applying the existing reasonable cost statute, controlling regulations, and any further guidance that CMS has issued. The methodology set forth in § 2534.5 of the PRM is a proper interpretation of the statute and the Secretary's rules allowing an exception to the limits on reasonable costs based on atypical services.[26]

Accordingly, after review of the record and applicable law, the Administrator finds that the methodology set forth in § 2534.5B of the PRM is consistent with the plain meaning of §§ 1861(v) and 1888(a)-(c) of the Act, the legislative intent, and the regulations at 42 CFR 413.30.

---

[25] See Shalala v. Guernsey Memorial Hospital, 514 US 87, 96(1995) (The Supreme Court also explained that, "[t]he APA does not require that all the specific applications of a rule evolve by further more, precise rules rather than by adjudication."); Chrysler Corp. v. Brown, 441 US 281, 302, n. 31 (1979) ("An interpretive rule is issued by the agency to advise the public of the agency's construction of the statutes and the rules which it administers," quoting the Attorney General's Manual on the Administrative Procedure Act," 30 at n.3 (1947).).

[26] Similarly, the Intermediary's application of the methodology set forth at § 2534.5 of the PRM does not constitute a substantive rule, and is consistent with the reasonable cost rules in effect for the cost years at issue. Moreover, the nature of reasonable cost reimbursement requires the determination of allowable costs after the close of the cost reporting period. Application of any reasonable cost comparison determination would constitute a retroactive rulemaking under the Provider's definition of that term.

## DECISION

The Administrator reverses the decision of the Board in accordance with the foregoing opinion.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES.**

Date: 10/12/07

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Montefiore Medical Center | Michael O. Leavitt, Secretary, U.S. Department of Health and Human Services |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Bronx (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Vinson & Elkins, LLP 1455 Pennsylvania Avenue, N.W. Suite 600 Washington, DC 20004 202.639.6500 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ○ A. Antitrust

☐ 410 Antitrust

### ○ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)     OR     ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>  (criteria: race, gender/sex,<br>  national origin,<br>  discrimination, disability<br>  age, religion, retaliation)<br><br>*\*(If pro se, select this deck)\** | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>  (if Privacy Act)<br><br><br><br>*\*(If pro se, select this deck)\** | ☐ **152 Recovery of Defaulted**<br>  **Student Loans**<br>  **(excluding veterans)** |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting &**<br>  **Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights**<br>  **Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-**<br>  **Employment**<br>☐ **446 Americans w/Disabilities-**<br>  **Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment &**<br>  **Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of**<br>  **Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting**<br>  **(if Voting Rights Act)** |

**V. ORIGIN**

◉ **1 Original**<br>**Proceeding**  ○ **2 Removed**<br>**from State**<br>**Court**  ○ **3 Remanded from**<br>**Appellate Court**  ○ **4 Reinstated**<br>**or Reopened**  ○ **5 Transferred from**<br>**another district**<br>**(specify)**  ○ **6 Multi district**<br>**Litigation**  ○ **7 Appeal to**<br>**District Judge**<br>**from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. § 1395oo(f); action for judicial review under the Medicare Act.

**VII. REQUESTED IN**
**COMPLAINT**  CHECK IF THIS IS A **CLASS**<br>☐ **ACTION** UNDER F.R.C.P. 23  **DEMAND $** [_____]  Check YES only if demanded in complaint<br>**JURY DEMAND:**  YES ☐  NO ☒

**VIII. RELATED CASE(S)**
**IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE  December 10, 2007  SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.